# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MYKEL POWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 17-10776-FDS |
| ) | |
| SGT. BRIAN HOLMES, in his individual ) | |
| and his official capacity as a Sergeant ) | |
| of the Stoughton Police Department, and ) | |
| JAMES O'CONNOR, in his individual ) | |
| and his official capacity as a Detective ) | |
| of the Stoughton Police Department, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SAYLOR, J.

This is a dispute over the disposal by police officers of confiscated firearms. Plaintiff Mykel Powell alleges that defendants Brian Holmes and James O'Connor, both Stoughton police officers, deprived him of the use and value of his firearms without due process of law.

According to the complaint, Powell had a firearms license and owned several weapons. When he was indicted on criminal charges, the Stoughton police suspended his license and required him to surrender the weapons. After the charges were dropped, Powell asked for the weapons back. Instead, the police refused, and eventually destroyed the confiscated weapons. Powell essentially contends that the loss of the use and value of his property, for which he received no compensation, violated his due-process rights under the Constitution.

Defendants have moved to dismiss on the ground that the complaint fails to state a claim upon which relief can be granted. For the reasons set forth below, that motion will be denied.

**I.     Background**

    **A.     Factual Background**

The following facts are set forth as alleged in the complaint.

Mykel Powell was at the relevant time a resident of Stoughton, Massachusetts. As of 2015, he had a Class A license that permitted him to carry firearms. (Compl. ¶ 9).

Brian Holmes is a sergeant in the Stoughton Police Department. (*Id.* ¶ 2). Among other things, Holmes handles applications for firearm permits. (*Id.* ¶ 10). James O'Connor is a detective in the Stoughton Police Department. (*Id.* ¶ 3).

On November 29, 2015, the Stoughton Police Department suspended Powell's firearms license pending the resolution of criminal charges against him. (*Id.* ¶ 9). According to the complaint, Sgt. Holmes came to Powell's house and took possession of:

    a.    a Bushmaster AR15 [rifle] (serial no. HFN6346),

    b.    an S&W SD9 [pistol] (serial no. BFI643914),

    c.    6 pre-ban [sic] AR 30 round magazines,

    d.    1 magazine for the S&W SD9, [and]

    e.    the bag for the rifle.

(*Id.* ¶¶ 11-12). The complaint alleges that the fair market value of the property taken was at least $1,532.24. (*Id.* ¶ 13).

The complaint alleges that Powell was not provided a receipt. (*Id.* ¶ 14). Instead, he "was told to call Sgt. Holmes once he is clear from his criminal charges." (*Id.* ¶ 15). It further alleges that Powell was not given notice in writing of the licensing authority's ability to transfer the firearms a year after they were surrendered under Mass. Gen. Laws ch. 140, § 129D. (*Id.* ¶ 16); *see* Mass. Gen. Laws ch. 140, § 129D ("The licensing authority shall at the time of delivery or surrender inform the person in writing of the authority's ability, within 1 year after

delivery or surrender, to transfer the firearms, rifles, shotguns and machine guns and ammunition to any licensed dealer or other person legally permitted to purchase or take possession.").

On August 3, 2016, approximately eight months later, the criminal charges against Powell were dismissed. (*Id.* ¶ 17). On August 5, 2016, Powell "left a telephone message for Sgt. Holmes informing him that the criminal case against him was dismissed." (*Id.* ¶ 18). He alleges that he tried several additional times to reach Sgt. Holmes by telephone. (*Id.* ¶ 19). He finally spoke to him on September 29, 2016. (*Id.* ¶ 19). According to the complaint, Sgt. Holmes refused to return the confiscated property and told Powell that he "needed a change in his lifestyle." (*Id.* ¶ 20).

At some point thereafter, Powell moved to Rhode Island. (*Id.* ¶ 21). Following the move, Sgt. Holmes allegedly informed Powell that he would return the firearms once he was lawfully able to possess firearms in Rhode Island. (*Id.* ¶ 22). Powell passed Rhode Island's "blue card" test on October 24, 2016, which allowed him to lawfully purchase or possess handguns in that state.

Powell alleges that he attempted to contact Sgt. Holmes again, but "was advised to contact" Det. O'Connor. (*Id.* ¶ 24). On November 14, 2016, Det. O'Connor informed Powell that his property had been sent for disposal on October 3, 2016. (*Id.* ¶ 25).

The complaint further alleges that Powell never received a receipt indicating that his property had been transferred to a bonded warehouse under Chapter 140, § 129D, operated by another person with an appropriate permit. (*Id.* ¶ 26); *see* Mass. Gen. Laws ch. 140, § 129D ("Any [dealer who operates a bonded warehouse] that takes possession of a weapon under the provisions of this section shall: (i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received;

3

and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section."). The complaint further alleges that Powell was denied the opportunity to transfer his property to a dealer or licensee under Chapter 140, § 129D. (Compl. ¶ 27); *see* Mass. Gen. Laws ch. 140, § 129D.

  **B.**  <u>**Procedural Background**</u>

  This action was filed on May 3, 2017. It alleges two counts under 42 U.S.C. § 1983, one for the loss of use of his property and one for the loss of the value of his property. (Compl. ¶¶ 30-37). The complaint alleges that defendants deprived him of his property without due process of law in violation of the Fourth, Fifth, and Fourteenth Amendments. (*Id.* ¶ 4). Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

**II.**  <u>**Standard of Review**</u>

  On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations and footnote omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to sho[w] that [plaintiff is] entitled to relief." *Ruiz Rivera v.*

*Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations in original) (quoting *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008)) (internal quotation marks omitted).

### III. Analysis

#### A. Massachusetts Procedures for Suspending or Revoking Firearms Licenses

A Class A firearms license entitles the holder to purchase, rent, lease, borrow, possess, and carry firearms, rifles, and shotguns and ammunition therefor, "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. Laws ch. 140, § 131(a). "A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such a license." *Id.* § 131(f).[1] The licensing authority may suspend licenses "in a reasonable exercise of discretion" and is to make the determination based on "reliable and credible information that the . . . licensee has exhibited or engaged in behavior that suggests that . . . the licensee may create a risk to public safety." *Id.* § 131(d).

The licensing authority is required to provide written reasons for its decision to suspend a firearms license. *Id.* § 131(f). A licensee who disagrees with the licensing authority's decision is not entitled to a stay of the suspension under any circumstances, but may seek judicial review within 90 days of receiving notice of that decision. *Id.*[2]

"Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D." *Id.* § 131(f). Section 129D requires persons whose

---

[1] The licensing authority is "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." Mass. Gen. Laws ch. 140, § 121.

[2] Note that if an appeal is pending, the obligation to turn over firearms in the licensee's possession is suspended. Mass. Gen. Laws ch. 140, § 129D; *Pasqualone v. Gately*, 422 Mass. 398, 404 (1996).

5

licenses have been suspended or revoked to deliver or surrender "all firearms, rifles, shotguns, and machine guns and ammunition" to the licensing authority "without delay." *Id.* § 129D. Although the person no longer has the right to possess the firearms himself, he may, within a year, give or sell them to another person who does have the right to possess them, whereupon the licensing authority must deliver the firearms to the transferee. *Id.* The licensing authority must give the person whose license was suspended written notice at the time the firearms are surrendered of his right to transfer them within one year. *Id.*

Upon receiving the firearms, the licensing authority may transfer possession of them "for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse," as long as the firearms are not evidence in a pending criminal case or investigation. *Id.* When that dealer takes possession, he shall "(i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section." *Id.* The dealer may auction any weapon in its possession if (1) authorized to do so by the licensing authority after one year, or (2) storage charges (which are assessed on the gun owner) have been in arrears for 90 days. *Id.* The proceeds of that auction are applied first to the storage charges and then returned to the owner of the weapon.

If the licensing authority cannot reasonably "ascertain a lawful owner" of the weapon within 180 days of acquiring it, the licensing authority may "in its discretion, trade or dispose of surplus, donated, abandoned or junk firearms, rifles, shotguns, or machine guns or ammunition to properly licensed distributors and firearms dealers," and the proceeds will go to the municipality in which the authority presides. *Id.*

6

If, after a year, the weapons have not been disposed of in any other way, the colonel of the state police may sell the firearms at a public auction and remit the proceeds to the state treasurer. *Id.*

"A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any." *Id.* § 131(f). Presumably, this would entitle a licensee to the return of his weapons, but there does not seem to be a statutory provision to that effect. *Cf. Andrade v. City of Somerville*, 92 Mass. App. Ct. 425, 109-10 (2017) (describing a situation where firearms were allegedly negligently returned to a licensee after a judge determined that the revocation of his license was in error).[3] Notably, § 129D requires that a transferee designated within a year by the person whose license was suspended must "affirm in writing that the purchaser or transferee shall not in violation of section 129C transfer the firearms, rifles, shotguns or machine guns or ammunition to the former owner," suggesting that the transferee cannot be identical to the owner (although such a transfer would not be a violation of § 129C if the owner were properly re-licensed).

### B. Fourteenth Amendment and Procedural Due Process

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

---

[3] Where the sole reason for the confiscation of the weapons is that a person's license has been suspended for failure to give notice of a change of address, the officer confiscating the weapons must provide the person with "a written inventory and receipt for all firearms, rifles or shotguns" and must return them to the owner "upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation" or may dispose of them as provided in § 129D. Mass. Gen. Laws ch. 140, § 131(m). There does not, however, appear to be a procedure for returning weapons upon reinstatement of a license suspended for another reason.

7

proceeding for redress." 42 U.S.C. § 1983. The statute provides a cause of action against police officers who have violated a plaintiff's constitutional rights "under color of state law," even if their actions in fact violated state law. *Monroe v. Pape*, 365 U.S. 167, 184-87 (1961) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Litigants are generally not required to exhaust potential state remedies before filing a § 1983 action in federal court. *Id.* at 183 ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.").

Nevertheless, a plaintiff still must allege a viable underlying constitutional violation. The complaint here makes allegations under the Fourth, Fifth, and Fourteenth Amendments.

As to the Fourth Amendment, the seizure of the weapons appears to be legal. Plaintiff does not appear to contest that defendants acted lawfully in suspending his Class A license on account of the pending criminal charges, or that defendants had the authority, under Mass. Gen. Laws ch. 140, § 129D, to take possession of his weapons; rather, plaintiff is complaining about what happened to his property after the charges were dropped. (*See* Compl. ¶ 31 ("The Defendants' failure to comply with the M.G.L. c. 140, § 129D, failure to return Mr. Powell's property, and the inappropriate handling of Mr. Powell's property deprived Mr. Powell of a property interest."); *id.* ¶ 35 ("Mr. Powell has not been given compensation for the loss and/or destruction of his property.")).

The Fifth Amendment does not apply because it only reaches due-process claims against the federal government. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due

8

Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Therefore, the question is whether the complaint states a claim under the Fourteenth Amendment.

Where a plaintiff sues under § 1983 for deprivation of property without due process of law, the inquiry as to whether he has been deprived of due process includes an examination of the available state-law remedies. *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981). Even if actions taken under color of state law resulted in deprivation of property, if pre-deprivation process would have been impracticable (and therefore not constitutionally required) and post-deprivation process under state law would provide an adequate remedy, then plaintiff has no claim for violation of due process. *Id.*; *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (expanding *Parratt* to intentional deprivations of property); *Zinermon v. Burch*, 494 U.S. 113, 139 (1990); *San Gerónimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 478-81 (1st Cir. 2012) (*en banc*) (reviewing Supreme Court precedents in this area).

In *Parratt v. Taylor*, 451 U.S. 527 (1981), prisoner Parratt ordered a hobby kit, which was lost by prison officials. *Id.* at 530-31. He sued those officials under § 1983, alleging that he had been deprived of property without due process of law in violation of the Fourteenth Amendment. *Id.* at 529. The Court ruled that he had not stated a claim for violation of procedural due process, because where there is a "random and unauthorized act by a state employee . . . the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.* at 541. The Court suggested that, in order for pre-deprivation process to be constitutionally required, there must be

9

some established state procedure that caused the deprivation:

> [R]espondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the state of Nebraska has provided respondent with the means by which he can receive redress for the deprivation.

*Id.* at 543 (citing Neb. Rev. Stat. ¶ 81-8,209 *et seq.* (1978), providing a tort-claims procedure for prisoners).

### C. Whether the Complaint States a Claim

As noted, the Massachusetts statute requires the temporary surrender of firearms if the owner's license is suspended after the filing of criminal charges. But the statute is oddly silent as to the issue of the *return* of any firearms so surrendered. Accused persons are of course presumed to be innocent until proven guilty, and plaintiff here was never convicted of anything. The firearms were his private property, and were not subject to any forfeiture proceeding. It thus appears that the police had no legal authority to keep (much less destroy) his firearms once criminal charges were dropped.

The issue here is of course complicated by the fact that a valid license is required to possess a firearm, and that defendant moved to a different state with its own licensing laws during the course of this dispute. Nonetheless, the police cannot simply seize private property and refuse to return it; there must be legal authority both for the seizure and for the retention of the property. And constitutional due process requires a fair procedure, or at a minimum an adequate post-deprivation remedy, to protect against unlawful seizures.

Defendants contend that their actions here in failing to return plaintiff's firearms fall into the category of "random and unauthorized" actions the state could not anticipate, for which pre-

deprivation procedure is inapplicable. *See Parratt*, 451 U.S. at 541. But it is unclear, at least at this stage, whether there was any state or town procedure available at all. And it is also unclear whether a police officer's actions can be considered "random and unauthorized" within the meaning of *Parratt* if there is no procedure or policy in place for the officer to violate.

Defendants further contend that a state-law action for conversion against the individual officers provides an adequate post-deprivation remedy. But that, too, is doubtful, for at least three reasons.

First, plaintiff would have to prove that the officers acted intentionally. An action for conversion requires that "the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property." *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002). "[I]t is no defense to conversion for defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." *Id.*[4] But "an act which is not intended to exercise dominion or control over a chattel but is merely negligent with respect to it is not a conversion, even though it may result in the loss or destruction of the chattel." Restatement (Third) of Torts § 224; *see also Damon v. Hukowicz*, 964 F. Supp. 2d 120, 143 (D. Mass. 2013) ("One in the possession of a chattel does not become a converter by making a qualified refusal immediately to surrender the chattel when the circumstances are such that the demand for immediate surrender is unreasonable.") (quoting Restatement (Second) of Torts § 238)).

Second, it is likely that defendants would claim immunity from suit. Although that claim would likely fail, there is at least some doubt on that score. Section 2 of the Massachusetts Tort

---

[4] Note that there is no private right of action under Mass. Gen. Laws ch. 140, § 129D, so that would not be an adequate state remedy for plaintiff's complaint here. *Mirsky v. Barkas*, 2011 WL 2371879, at *5-6 (Mass. Super. Ct. Jan. 31, 2011).

Claims Act provides that tort suits for deprivation of property must ordinarily be brought against the Commonwealth, to the extent the state officials were acting within the scope of their employment, and individual employees are immunized.[5] But Section 10 of the MTCA further provides that Section 2 "shall not apply to . . . any claim arising in respect of . . . the lawful detention of any goods or merchandise by any law enforcement officer." Mass. Gen. Laws ch. 258, § 10(d); *see Vining v. Commonwealth*, 63 Mass. App. Ct. 690, 691-96 (2005). That same section provides that the Commonwealth has not waived its sovereign immunity for claims arising from intentional torts. Mass. Gen. Laws ch. 258, § 10(c); *Mason v. Mass. Dep't of Envtl. Prot.*, 774 F. Supp. 2d 349, 356 (D. Mass. 2011) (explaining that conversion is an intentional tort for which the Commonwealth cannot be held liable).

Thus, the Commonwealth has explicitly declined to waive its sovereign immunity with respect to claims arising out of the lawful detention of goods by a law enforcement officer, such as the conversion claim contemplated here. By providing that Section 2 "shall not apply" to the listed types of claims, Section 10 also negates the part of Section 2 that absolves public employees from liability, thereby exposing employees to suits for such claims. In other words, Section 10(d) does not provide immunity to individual defendants—it only provides immunity to the Commonwealth. *See Nelson v. Salem State College*, 446 Mass. 525, 536-37 (2006) (explaining that, because the MCTA does not waive sovereign immunity for intentional torts, a public employee may be personally liable for an intentionally tortious act); *Baker v. Gray*, 57

---

[5] Section 2 provides that "[p]ublic employers shall be liable for injury or loss of property . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances." Mass. Gen. Laws ch. 258, § 2. It further provides that "[t]he remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or[] the public employee . . . whose negligent or wrongful act or omission gave rise to such a claim, and no such public employee . . . shall be liable for any injury or loss of property . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment." *Id.*

Mass. App. Ct. 618, 625 (2003) (explaining that a post-deprivation action for conversion against a state official who had confiscated plaintiff's motorboat dealer certificate of number was available and in fact had been brought); *see also Kelley*, 288 F.3d at 11-13 (1st Cir. 2002) (discussing the tort of conversion in connection with confiscated property); *Damon v. Hukowicz*, 964 F. Supp. 2d at 142-43 (same); *cf. Husdon*, 468 U.S. at 535-36.[6] Therefore, it is likely that sovereign immunity would not bar a claim for conversion against the individual defendants here.[7] There is, however, authority to the contrary.[8]

Finally, plaintiff contends that an action for conversion is an inadequate post-deprivation remedy on the ground that being forced to file a lawsuit of any kind for the return of his firearms violates due process. *See Richer v. Parmalee*, 189 F. Supp. 3d 334 (D.R.I. 2016). In *Richer*, the plaintiff's firearms were seized because he was considered a danger to himself and his family. *Id.* at 338. Having been released from the mental hospital and never charged with any crime, he repeatedly requested that his firearms be returned, to no avail. *Id.* They were finally returned six

---

[6] The MTCA does bar intentional tort claims against officers in their *official* capacities. *Mirsky v. Barkas*, 2011 WL 2371879, at *4 (Mass. Super. Ct. Jan. 31, 2011).

[7] It is also possible that Massachusetts common-law immunity would apply to shield defendants. "At common law, . . . a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." *Nelson*, 446 Mass. at 537 (granting common-law immunity to officials sued in their individual capacity for the tort of invasion of privacy). That immunity is only available for discretionary functions; it applies when "a public officer . . . is authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction." *Gildea v. Ellershaw*, 363 Mass. 800, 820 (1973). The precise scope of what counts as "discretionary" under this doctrine is unclear, and, in any event, the Court cannot determine in this context whether the officers, in refusing to return the weapons and, later, destroying them, were acting in a discretionary capacity.

[8] Plaintiff points to an unpublished Massachusetts Appeals Court decision that relies on *Vining* and holds that § 10(d) provides immunity to law enforcement officers. *Laurore v. O'Hearn*, 2017 WL 657646 (Mass. App. Ct. Feb. 17, 2017). The reasoning of that case, however, appears to be flawed, in that it considered the result to be controlled by *Vining*, even though the defendant in *Vining* was the Commonwealth and the defendants in *Laurore* were individual officers. Furthermore, the plain language of the statute makes clear that Section 10 does not grant immunity to officers; it merely retains the sovereign immunity of the Commonwealth with respect to certain actions by officers.

years later, after he filed a suit for injunctive and declaratory relief, but the state had provided no process short of that for him to be heard. *Id.* The court, applying the test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), held that additional post-deprivation process was required, and entered summary judgment for the plaintiff on his due process claim. *Id.* at 339-42.

There is certainly some force in the argument that if the only remedy is a lawsuit for an intentional tort—that is, a remedy that requires a person to hire a lawyer, file suit, pay a filing fee, litigate, and prove that he was wronged—the due-process clause has not been satisfied. On the other hand, citizens routinely vindicate their rights through lawsuits, and the Court is not prepared to say that any time a party must litigate to assert a right—even a straightforward right, such as the right to one's own property—that party's right to due process has also been violated. Indeed, under some circumstances, the availability of a lawsuit has been held to be adequate post-deprivation process. *See Parratt*, 451 U.S. at 543 (holding that a lawsuit under Nebraska state law was a sufficient post-deprivation remedy).

In any event, the resolution of these questions appears to depend to a significant degree on the facts of the case. It is far from clear exactly what happened here, and what, if any, recourse plaintiff had available to him. The issues are therefore not appropriate for resolution on a motion to dismiss. The motion will accordingly be denied, and the issues raised in this opinion may be revisited upon the development of a full factual record.

## IV. <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor<br>F. Dennis Saylor, IV<br>United States District Judge

Dated: February 1, 2018